

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BILL GEORGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:10-cv-3389-AKK** |
| **COUNTY OF JEFFERSON, et al.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Bill George, a former inmate at the Jefferson County Jail ("the Jail"), filed this action against Jefferson County Sheriff Mike Hale in his official capacity, and against Deputy Cynthia Davis and Health Assurance, LLC nurses Karen Fowler, Elliott Gamble, Jason Ballenger, Marilyn Hatcher, Vicky Pickett, Brenda Calvert, Bernice Eatmon, and Betty Davidson, for alleged deliberate indifference to his serious medical needs.[1]  Docs. 1, 91.  Except for Sheriff Hale against whom George's only remaining claims are under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. ("Rehab Act"), George

---

[1]George also named "Nurse Brown" and "Nurse Quarrelson" as defendants, doc. 91 at 4, but never served them.  Docs. 116 and 121.  Therefore, the claims against them are due to be dismissed for want of prosecution.  Doc. 19 at 5-6.  Similarly, the court previously dismissed George's claims against Clarice Calvin, the City of Hueytown, and Officer Brent Akin of the Hueytown Police Department.  Docs. 74, 130, 137.  The court also dismissed George's § 1983 claim for money damages and injunctive and declaratory relief against Sheriff Hale.  Doc. 74.

alleges claims under Section 1983 for violations of his Fourth, Eighth, and Fourteenth Amendment rights against the defendants.  Doc. 91 at ¶¶ 39-53.

The defendants, minus Davidson who has ignored all efforts to reach her,[2] have moved for summary judgment and their motions are fully briefed and ripe for resolution.  Docs. 144, 145, 147, 152, 156.  For the reasons stated below, except for the motions by Fowler and Gamble, summary judgment is due to be granted for the defendants.

# I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish

_____

[2]George has moved for sanctions against Davidson for failing to appear for her deposition.  Doc. 142.

that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,1563 (11th Cir. 1989)).

## II.  FACTUAL BACKGROUND

George suffers from seizures occurring "perhaps every eight months" and back pain for which his treating physician prescribed Klonopin and Methadone, respectively. Doc. 153-1 at 2. At issue in this lawsuit is George's contention that defendants showed deliberate indifference to his seizure condition when they failed to provide him Klonopin during his eleven-day incarceration at the Jail and discriminated against him due to his purported disability.

### A.    The Jail's intake and medical procedures

During the time relevant to this lawsuit, Health Assurance, LLC had the contract to provide inmates at the Jail "reasonably necessary medicines, medical attention, medical treatment, and healthcare." Doc. 146-7 at 2. Health Assurance,

in turn, employed the Jail's medical staff, including physicians, dentists, nurses, and a psychiatrist, and implemented its own medical protocols and policies to treat the inmates. *Id.* at 2; docs. 146-9; 146-10; 146-11.  As part of Health Assurance's obligation to treat inmates, during the booking process, a Health Assurance intake nurse completed an intake evaluation on a new inmate's medical history and provided the inmate documentation on the policies regarding sick call procedures, emergency medical services, and medication services.  Doc. 146-16 at 11-14.  If the new inmate informed the intake nurse about a prescription medication, the intake nurse also completed a prescription verification form and submitted it to the pharmacy medical staff to verify the inmate's prescription and to obtain approval from the Jail physician to dispense the medication.  Docs. 146-8 at 36; 146-17 at 7; 146-20 at 5.  The policies that the intake nurse handed out instructed the new inmates to "notify the deputy on duty to call a medical supervisor" in the event the inmate failed to receive his or her medication within seventy-two hours of booking.  Doc. 146-16 at 11.

Inmates requested non-emergent care by completing a sick call request form, which was "available on the AM & PM Medication Run," and was "picked up on the AM Medication Run by Medical Staff Only."  Doc. 146-16 at 11.  Based on the information the inmate provided on the form, a nurse determined whether a physician would evaluate the inmate.  Doc. 146-15 at 4.  For emergent care, a floor

4

deputy sheriff contacted central control to announce a medical emergency or
"Code White." Doc. 146-12 at 40. Central control then announced "over the
Jail's Public Address System that a Code White [was] occurring and [ ] the
location. The Jail's Medical Staff [responded] to the scene." *Id*. For a seizure
related "Code White," the seizure-emergency protocol required the medical staff
to monitor and document the inmate's movements, injuries, vital signs, and
neurological status, assess whether the inmate responded to commands, interview
witnesses, and refer the inmate to a physician. Doc. 146-11 at 109. Also, for
inmates with a history of seizures, the seizure protocol required the medical staff
to determine the inmate's medications, if any, and compliance with the
prescription regimen. *Id*.

Inmates that required medical attention or observation were housed on
medical levels two or three. Level two, which has a control booth, intercom
system, and video surveillance, was used for inmates that required minimal
medical care. Docs. 146-3 at 4-5; 146-6 at 3-4. A deputy attended the control
booth and another assisted on the floor, except that when only one deputy was on
duty, he or she remained in the control booth. Docs. 146-3 at 5; 154-1 at 21-22,
26. Level three housed the medical clinic, pharmacy, and medical observation
cells, and was used to house inmates who required more intensive medical
monitoring. Doc. 146-6 at ¶ 3. Only the medical staff had the authority to assign

inmates to level three.  *Id*.  For inmates arriving at the Jail on a prescription for

Methadone, Health Assurance utilized a standing detoxification protocol involving

Librium and Clonidine and assigned the inmate to level two for medical

monitoring.[3]  Docs. 146-13 at 17; 146-16 at 4; 146-20 at 25; 146-38 at 5; 146-36

at 2.

## B.     George's arrest and incarceration

On October 11, 2009, Officer Brent Akin stopped George for a traffic

violation and arrested George because of an outstanding warrant.  Doc. 146-27 at

12.  Akin transported George to the Hueytown Police Station and then arranged

for George's transfer to the Jail, where George was booked using the standardized

procedures.[4]  *Id*. at 12-13, 19; doc. 146-1.  George, who was on various

medications at the time of his arrest, arrived at the Jail without his medications and

believes that Akin left the medications, which George had in an unmarked

container, in George's car.  Doc. 146-27 at 9, 13.

---

[3]Librium (Chlordiazepoxide) is used to treat anxiety, acute alcohol withdrawal, and is an anti-tremor agent, and Clonidine is used to treat opioid withdrawal, anxiety and panic disorders, high blood pressure, and certain pain conditions.  Elsevier Saunders, Dorland's Illustrated Medical Dictionary, 345, 373 (32d ed. 2012).

[4]Although it is not relevant to the dispute before this court, the first part of booking consisted of a deputy gathering information and recording it on a form that was not made a part of the inmate's medical file.  Docs. 153-4 at 6; 146-8 at 6.  In George's case, the booking deputy recorded that George had a serious injury or illness, a dependency on drugs, prescriptions for Methadone, Klonopin, and testosterone, and would experience withdrawal symptoms such as sickness and seizures.  Docs. 146-1 at 17; 146-27 at 19-20; 153-4 at 6.

As part of his booking, George met with Health Assurance's intake nurse Elliott Gamble and relayed that he had a prescription for Klonopin and Methadone, used Weldon Drugs in Hueytown, had arthritis/joint problems, and no seizures or "visible signs of illness, injury or pain indicating need for immediate care."  Docs. 146-16 at 2, 3, 11; 146-20 at 12; 146-27 at 20.  Despite George mentioning two prescriptions, Gamble focused solely on the Methadone, which he reasoned that George took to treat his back pain, and neglected to submit a medication verification form for the Klonopin.  Doc. 146-20 at 13-14, 25.  In light of the Methadone prescription, Gamble followed the Jail's standing detoxification order, assigned George to level two, and requested that the Jail place George in a bottom bunk bed due to a risk of disorientation and seizures from the detoxification protocol.  *Id*. at 14-15; docs. 146-16 at 2, 8; 146-6 at 5-6.  While on level two, medical staff routinely took George's vital signs as part of his detoxification program.  Doc. 146-38 at 5.

A few days after his arrest, George informed his daughter Casey Worthen that he was not receiving his medications and that he was sick.  Doc. 146-40 at 10. Worthen apparently called the Jail and informed Karen Fowler, a registered nurse and the Health Services Administrator, that George needed to take Klonopin to prevent seizures.  *Id*.; doc. 143-13 at 5.  However, Fowler testified that she does not remember receiving a call from Worthen.  Doc. 146-13 at 43.

On October 16, 2009, George submitted a Health Services Request form in which he reported experiencing back pain, colon cancer, infection, seizures, spinal stenosis, degenerative disc disease, asbestosis, and silicosis, and asked to see a psychiatrist. Doc. 146-27 at 39. Allegedly, George was hallucinating when he completed the form due to the failure to provide him his medications. Doc. 146-27 at 10, 38-39. George testified also that he asked another inmate to complete the same form daily because he required medical attention. Docs. 146-27 at 10, 38-39;146-16 at 10. However, George's file contains only the October 16, 2009 form George filled out. Docs. 146-16 at 10; 146-27 at 31. Likewise, the Medication Administration Record, which shows that George received Librium at least six times, Tylenol twice, and other medications, contradicts George's testimony that he received only one Tylenol and Librium during his incarceration. Docs. 146-27 at 23, 54; 146-38 at 7-8. Interestingly, there is no evidence showing that George received the Clonidine the physician also prescribed for the detoxification. Docs. 146-16 at 4; 153-15 at 4-5; 146-9 at 53.

The day after George submitted the Health Services Request form, a deputy initiated a "Code White" after seeing George in a seizure-like state. Doc. 146-23 at 3. Registered nurse Jason Ballenger and pharmacy nurses Marilyn Hatcher and Vicky Pickett responded and found George "lying on [the] floor shaking" and stating that he needed Klonopin because of his seizure. Docs. 153-6 at 9; 153-16

at 48; 146-15 at 24; 146-17 at 4; 146-21 at 5.  After determining that George was

not having a seizure, Ballenger transported George to the medical clinic on level

three for twenty-four hour observation "in case [George] has a seizure or if he had

a seizure, somebody can witness it and we can be able to take further steps, if

necessary."  Doc. 146-15 at 24.  Ballenger also instructed Pickett to complete a

Medical Status Change Form to reflect that George would "be on camera for close

medical observation for 24 [hours]."  Docs. 146-16 at 8; 146-21 at 18.  Finally,

Ballenger interviewed witnesses about the incident and reviewed the medical

intake form, which failed to mention George's seizure condition.  Docs. 146-15 at

24; 146-16 at 9.  The medical staff returned George to level two the next day.  Doc

146-23 at 14, 18.

Two days later, a deputy called a "Code White" after observing George in

another seizure-like state.  Doc. 146-23 at 31.  Pharmacy nurses Brenda Calvert,

Bernice Eatmon, and Betty Davidson responded and transported George to the

medical clinic.  Docs. 146-18 at 4, 7-8.  After taking George's vital signs and

finding George "alert, verbal, walking, [and in] no distress," Calvert returned

George to level two because George declined to remain on level three for medical

observation.  *Id*. at 4, 7-8; doc. 146-16 at 9.  The next day, per George's request,

the Jail's mental health physician examined George, noted that George admitted

having hallucinations and suffering from paranoia and anxiety, and ordered anti-

9

anxiety and anti-depressant medications.  Doc. 146-16 at 7.

On the morning of October 22, 2009, George experienced an episode in the shower that caused Deputy Davis to call Nurse Fowler for assistance.  Docs. 146-16 at 6; 146-23 at 43l.  Fowler, who examined George in the medical clinic, described George as "disoriented, diaphoretic, [and] unable to stand unassisted." Doc. 146-16 at 6.  Paramedics transported George to Cooper Green Hospital, where a physician diagnosed George with delirium tremens versus Benzodiazepam withdrawals and admitted him to the medical intensive care unit ("MICU").  Docs. 146-39 at 4; 146-16 at 6; 146-13 at 40.  That same afternoon, a MICU physician described George as "confused and at times not making sense," oriented to person and month "sometimes," and experiencing jitters and tremors and with a questionable history of seizures.  Doc. 146-39 at 16-18.  The physician diagnosed George with an altered mental state and ordered Librium, Clonidine as needed, and Ativan for George's anxiety.  *Id*. at 16-18, 24.

The next day, a consulting physician determined that George had "substance dependence and inadequate detoxification from Methadone and Klonopin" and possible seizure, and ordered Klonopin and Methadone detoxification.  Doc. 146-39 at 7.  An attending physician, who concurred with the assessment, noted that George was admitted with an "[altered] mental status and possible seizure [from] rapid detox from chronic high-dose Klonopin and Methadone."  Doc. 146-39 at

15.  On the third day, another physician also noted that George suffered from

altered mental status "likely due to incomplete withdrawal/detox from Klonopin

and Methadone," and that he planned to discharge George the following day if

stable since George was "doing well [and] better oriented."  Doc. 146-39 at 20.

On George's discharge on October 25, 2009, the attending physician described

George as

> [a]lert, oriented, pleasant [and] cooperative. [ ] Pat[ient] now states he
> has been on chronic Klonopin 2 mg QID [and] Methadone 60 mg TID
> via Dr. Livingston in Bessemer, and that he has a current
> [prescription].  He intends to continue care under Dr. Livingston.
> States Klonopin [is] for seizures and Methadone for pain.  Doses
> verified via Alabama Rx website.  No Rx given today.

Doc. 146-39 at 22.  The Jail released George the same day since the court had

reinstated George's bond.  Doc. 146-1 at 4.

## III.  <u>ANALYSIS</u>

George raises claims under § 1983 for deliberate indifference and the ADA

and the Rehab Act for discrimination based on a disability.  Initially, George's §

1983 claim encompassed allegations related to the failure to provide his Klonopin

prescription and to treat staph infections he acquired before and during his

incarceration.  Doc. 91 at 9-12, 15-16.  However, George abandoned the claims

regarding his staph infections.  *See* doc. 152 at 41-61.  The court addresses

George's remaining claims below, beginning with the § 1983 claims in section

11

III.A and then the disability claims against Sheriff Hale in section III.B.

## A.    Deliberate indifference to George's serious medical needs

Only deliberate indifference to *serious* medical needs is actionable under § 1983.  *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  To sustain a claim, the conduct of a prison official must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain.  *See Bass v. Sullivan*, 550 F.2d 229, 230 (5th Cir. 1977).  Mere negligence is insufficient.  *See Fielder v. Brossard*, 590 F.2d 105, 107 (5th Cir. 1979).  Rather, an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that a delay would exacerbate.  *See Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994).

To establish a constitutional violation based on deliberate indifference, "'[f]irst, the plaintiff must prove an objectively serious medical need.  Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need.'"  *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (citing *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)).  Defendants do not

dispute that George's seizure condition qualified as a serious medical need.  *See*

docs. 145 at 37, 41; 147 at 20-28.  Therefore, to prevail, George need only satisfy

the deliberate indifference prong by proving "'(1) subjective knowledge of a risk

of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross]

negligence.'" *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing

*Bozeman*, 422 F.3d at 1272 (alternation in original)).  Specifically, George must

show that the official "must *both* be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, *and* [he] must also draw the

inference." *Bozeman*, 422 F.3d at 1272 (citing *Farmer v. Brennan*, 511 U.S. 825,

837 (1994)) (emphasis added).  Furthermore, subjective knowledge is a question

of fact "subject to demonstration in the usual ways, including inference from

circumstantial evidence, and a factfinder may conclude that a prison official knew

of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511

U.S. at 842.  Finally, in cases where the inmate's health deteriorated due to a delay

in medical care, gross negligence can be shown by "(1) the seriousness of the

medical need; (2) whether the delay worsened the medical condition; and (3) the

reason for the delay." *Goebert*, 510 F.3d at 1327.

　　The court turns now to George's claims against each defendant.

1.   *Nurse Karen Fowler*

George contends that Fowler showed deliberate indifference to his serious

medical need by ignoring his daughter's warning that George "needed his

[Klonopin] because he had grand mal seizures."  Docs. 146-40 at 10; *see also* 146-

27 at 46.  Because an individual "acts with deliberate indifference when [she]

knows that an inmate is in serious need of medical care, but [she] fails or refuses

to obtain medical treatment for the inmate," the court must consider Fowler's

"knowledge of the seriousness of [George's] medical condition and [her] action, or

inaction, in the face of such knowledge." *Lancaster*, 116 F.3d at 1425-26.

Although Fowler has no recollection of Worthen's purported call, doc. 146-13 at

43, the court must view the facts in the light most favorable to George.  As such,

the court assumes that Worthen spoke to Fowler and that Fowler failed to take any

action in response.  Under the law, officials are deliberately indifferent when they

fail to act after an inmate's relative informs them that the inmate would experience

grand mal seizures if the inmate did not receive medication. *See Lancaster*, 116

F.3d at 1425-26.  Moreover, an individual "acts with deliberate indifference when

[she] intentionally delays providing an inmate with access to medical treatment,

knowing the inmate has a life-threatening condition or an urgent medical condition

that would be exacerbated by delay." *Pace v. Capobianco*, 283 F.3d 1275, 1282

14

(11th Cir. 2002). Therefore, viewing the evidence in the light most favorable to George, if the jury believes George and Worthen, there is sufficient evidence to show that Fowler failed to act despite knowledge of George's medical condition and specific needs. As a result, Fowler's motion is due to be denied.

2. *Nurse Elliott Gamble*

George's claim against Gamble is based on Gamble's failure to record George's seizure condition on the intake form, and to verify George's Klonopin prescription. Docs. 146-27 at 19-20; 146-16 at 2-3; 146-20 at 11-12. While, ordinarily, "[m]ere incidents of negligence [ ] do not rise to the level of constitutional violations," *Harris*, 941 F.2d at 1505; *see also Nelson v. Prison Health Servs., Inc.*, 991 F. Supp. 1452, 1464 (M.D. Fla. 1997) (screening nurse was not deliberately indifference when she "apparently recorded an inaccurate version of [the plaintiff's] medical condition."), the facts here are sufficient at this juncture for George to survive summary judgment. As a trained nurse, Gamble knew that seizures are a severe condition that Klonopin is prescribed, in part, to treat and that a sudden discontinuance can cause seizures. Doc. 146-20 at 11. Furthermore, although George provided Gamble the information for Gamble to complete a medication verification form so that the pharmacy staff could then confirm George's medications, Gamble failed to fill out the form. Doc. 146-16 at

14. Significantly, Gamble did so with full knowledge that, as the intake nurse, he was the only one in a position to accurately record George's condition and medications.  Docs. 146-20 at 5-6, 11-12.  In light of George's contention that the delay in receiving Klonopin caused his condition to deteriorate and the evidence regarding Gamble's familiarity with Klonopin, George may have sufficient evidence for a jury to find that Gamble's failure to record his seizure condition and to complete the prescription verification form exceeded mere gross negligence. *See Goebert*, 510 F.3d at 1327-28; *Nelson*, 991 F. Supp. at 1463 (nurses' delay in verifying and ordering heart medication was conduct in deliberate indifference to inmate's medical needs).  Therefore, Gamble's motion is due to be denied.

       3.   *Nurse Jason Ballenger*

       George's claim against Ballenger is based on Ballenger's purported failure to follow the seizure emergency protocol or to "obtain medical treatment or necessary prescription medications" after the October 17 "Code White."  Doc. 146-27 at 28-29.  Ballenger acknowledged that George informed him that he was having a seizure and "was saying [ ] fairly regularly, that he needed his Klonopin." Doc. 146-15 at 26.  Ballenger also admitted knowing that Klonopin was prescribed for seizures and the ramifications of its sudden discontinuance.  Doc. 146-15 at 22.  Nonetheless, George's contentions are unavailing because

Ballenger had no need to implement the seizure-emergency protocol since he did not witness the seizure and, critically, his examination determined that George was stable. Doc. 146-15 at 24. Moreover, Ballenger took reasonable steps to treat George. Specifically, after transferring George to the medical clinic, Ballenger assessed George's condition, noted stable vital signs, and assigned George to level three for 24-hour medical monitoring and, if needed, to administer the appropriate medical care. Docs. 146-15 at 24; 153-6 at 9. Ballenger also reviewed George's intake form, which noted no history of seizures. Doc. 146-15 at 24-25.

Based on this evidence, George failed to establish that Ballenger exhibited "a total failure to obtain medical treatment" or "an unreasonable delay." *Lancaster*, 116 F.3d at 1126-29. In fact, Ballenger assessed George, provided adequate medical care, and, since the detoxification protocols for Methadone and Klonopin are similar, had a reasonable basis for assuming that George's detoxification order applied to both medications. At best, the evidence establishes that Ballenger acted negligently by relying exclusively on the erroneous intake form. Because "[m]ere negligence in diagnosing or treating a medical condition is an insufficient basis for grounding liability on a claim of medical mistreatment," *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (citing *Estelle*, 429 U.S. at 106), Ballenger's motion is due to be granted.

4.    *Nurse Marilyn Hatcher*

Similar to his claim against Ballenger, George contends that Hatcher failed

to provide him with adequate medical care when Hatcher responded to the October

17 "Code White."  Doc. 146-27 at 28-29, 44.  The evidence also fails to support

this contention.  Hatcher is a pharmacy nurse responsible for taking blood pressure

and blood sugar levels, checking with pharmacies to verify medications, and

dispensing medications.  Doc. 146-17 at 4, 7.  The only interaction Hatcher had

with George is reflected in the October 17 daily report when she joined other

nurses in responding to the "Code White."  Doc. 153-16 at 54.  Significantly,

George has presented no evidence that suggests that Hatcher had the authority to

make medical decisions, provide care to George, or knew that George required

treatment or medicine, and refused to provide the required care.  *See* docs. 146-21

at 14; 152 at 46-54; 146-17 at 7-8.  Therefore, Hatcher's motion is due to be

granted.

5.    *Nurse Vicky Pickett*

The final contention regarding the October 17 "Code White" is directed at

Pickett for purportedly ignoring George's pleas that he needed Klonopin to

prevent seizures.  George maintains that, based on her belief that inmates fake

seizures, Pickett failed to refer him to a physician, complete a medication

verification form, and dispense his detoxification medications.  Docs. 146-21 at

16-18; 146-27 at 44, 54.  George's contentions are unavailing, in part, because the

allegation regarding dispensing of medications is based on George's vague

description of Pickett as the "lady that brought around the medicine."  Doc. 146-

27 at 54.  This description fails to identify Pickett with the specificity necessary to

sustain a claim.  Likewise, the other two allegations also fail to sustain a claim

against Pickett because Pickett had no authority to make health care decisions or

prescribe medication.  Doc. 146-21 at 5, 7, 14.  In fact, as a pharmacy nurse, when

an inmate complained about not receiving the proper medication, Pickett simply

instructed the inmate to complete a sick call form so that the medical staff "can go

to the proper procedures to find out what medications they're on, or if any kind of

mistake was made."  Doc. 146-21 at 17.  In other words, Pickett was in no position

to deny George treatment.  Moreover, contrary to George's contentions, Gamble

had primary responsibility for completing medication verification forms, and

during the October 17 "Code White," Ballenger, the registered nurse in charge,

made decisions regarding George's health care.  Docs. 146-20 at 11; 146-21 at 14.

Therefore, even if Pickett heard George ask for Klonopin or ignored George

because she believed that George's seizure was a ruse, doc. 146-21 at 20-21,

Pickett's position prevented her from making medical treatment decisions or

administering medical care.  Accordingly, Pickett's motion is due to be granted.

6.   *Nurse Brenda Calvert*

George contends that Calvert ignored his need for medical treatment when she failed to initiate the seizure-emergency protocol or render any other treatment after she responded to the "Code White" on October 20.  Docs. 146-23 at 31; 146-27 at 28-29, 45.  It is undisputed that Calvert found George "lying on the floor shaking."  Doc. 146-23 at 31.  However, apparently, Calvert determined that George was not having a seizure since her examination revealed that George was "alert and verbal."  *See* docs. 146-23 at 31; 146-16 at 9.  Calvert then transported George to the medical clinic, where she read the progress note from the October 17 "Code White" and noted that George's vital signs were normal.  Docs. 146-16 at 9; 146-18 at 8.  Thereafter, consistent with George's request not to return to the medical observation floor, Calvert returned George to level two.  *Id*.  In effect, by making clear that he did not want to go to level three, George refused further treatment and cannot now allege that Calvert ignored his medical needs.  *Taylor v. Adams*, 221 F.3d 1254, 1258-59 (11th Cir. 2000) (finding that medics were not deliberately indifferent to detainee who declined treatment).  In any event, George's stable vital signs and alert and verbal status prevents this court from inferring that Calvert disregarded George's need for further medical care.

Therefore, Calvert's motion is due to be granted.

    7.    *Nurse Bernice Eatmon*

Without any evidentiary support, George contends that Eatmon ignored his serious medical condition when she responded to the October 20 "Code White." Docs. 146-27 at 28-29.  The scarce record demonstrates that Eatmon's only contact with George occurred during the October 20 "Code White" when she assisted Calvert in transporting George to the medical clinic.  Docs. 146-19 at 7; 146-23 at 31.  There is simply no other evidence establishing that Eatmon, a licensed practical nurse and pharmacy nurse, participated on any other occasion in treating George or knew of George's need for medical attention.  Critically, Eatmon's position did not allow her to make medical decisions regarding inmates. Doc. 146-19 at 4.  Therefore, Eatmon's motion is due to be granted.

    8.    *Deputy Cynthia Davis*[5]

Finally, George contends that Deputy Davis ignored George's cell mate Cecil Macon's warning that George was suffering from uncontrollable seizures. Doc. 153-17 at 4.  This claim fails because Macon could not describe the conversations he had with Deputy Davis and stated only that Deputy Davis "had to have known that [George] was experiencing life threatening seizures."  Doc. 153-

---

[5]The court previously limited the factual context of George's deliberate indifference claim against Deputy Davis to the seizures.  Doc. 74 at n. 9.

17 at 4.  Without more, the court has no basis to infer that Deputy Davis knew that George experienced seizures and disregarded George's need for medical attention. In fact, even George acknowledged that Deputy Davis probably did not know about the seizures.  As George admits, although Deputy Davis worked on level two on eight of George's eleven days of incarceration, it is unlikely that Deputy Davis knew about George's seizures during six of those eight days since she was the only deputy working level two and could not leave the control booth.  Doc. 146-37.  In light of George's failure to present any evidence that suggests that Deputy Davis witnessed George in distress or otherwise knew that George needed medical attention and disregarded that need, Deputy Davis's motion is due to be granted.

In summary, except for the claims against Fowler and Gamble, defendants' motions for summary judgment on the § 1983 claims are due to be granted.

**B.      George's ADA and Rehab Act claims against Sheriff Hale in his official capacity[6]**

George alleges that Sheriff Hale violated the ADA and Rehab Act by denying him medical services and a reasonable accommodation, and by placing him on the detoxification protocol.  Doc. 146-27 at 19-20.  Because the ADA and Rehab Act are analyzed under the same framework, *see Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), the court will refer only to the ADA.

1.      *Denial of medical services*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[7]  42 U.S.C. 12132.  To state a

---

[6]"In their official capacity, [ ] Alabama sheriffs operating jails are state officers protected by Eleventh Amendment immunity."  *Taylor v. Adams*, 221 F.3d 1254, 1256 (11th Cir. 2000) (citation omitted).  However, under Title II of the ADA, "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."  *United States v. Georgia*, 546 U.S. 151, 154 (2006).  "Congressional abrogation of the States' sovereign immunity is valid when the statutorily proscribed conduct simultaneously violates a constitutional guarantee protected by the Fourteenth Amendment."  *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents*, 633 F.3d 1297, 1304 (11th Cir. 2011) (citing *Georgia*, 546 U.S. at 158-59).  Although states may waive their Eleventh Amendment immunity under the Rehab Act by voluntarily accepting federal funds, *Garrett v. Bd. of Trustees of the Univ. of Ala. at Birmingham*, 354 F. Supp. 2d 1244, 1246 (N.D. Ala. 2005), the court will not address this issue since the disability claims are due to fail.

[7]Similarly, section 504 of the Rehab Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of [ ] his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

claim under Title II, "a plaintiff must allege: (1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.' 42 U.S.C. § 12132." *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). The court addresses these elements below.

a.   <u>Qualified individual with a disability</u>

To establish a disability claim, George must do more than show that he suffered from a seizure condition because "[m]erely having an impairment does not make one disabled for the purposes of the ADA." *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 195 (2002). Rather, to sustain a claim, "[t]he impairment's impact must also be permanent or long term" and not "mitigated by corrective measures." *Id*. at 198; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 487 (1999). Here, George cannot establish that he is a qualified individual with a disability in light of his testimony that he had not had a seizure in "[m]onths and months and months,"[8] took extended solo canoe trips, and had a "normal" life prior to his arrest: "I was doing fine before. I was normal. I could do anything I wanted to do. . . . [A]s long as I took my medication, you wouldn't know anything

---

[8]George's testimony is consistent with the medical records, which note that "he has a seizure perhaps every eight months." Doc. 153-1 at 2.

was wrong with me.  My knees, or anything.  People would say, ain't nothing

wrong with you."  Doc. 146-27 at 5-6, 27, 47, 50.  By George's own contention,

he is not disabled because his condition did not severely limit him.  *See* 42 U.S.C.

§ 12102(1)(A) (a disability is "a physical or mental impairment that substantially

limits one or more of the major life activities of such individual.").

        b.    <u>Denial of services based on disability</u>

Alternatively, even if George's seizure condition is a disabling condition,

George's claims still fail because he cannot establish the denial of medical

services and programs necessary to sustain a disability claim.  *Shotz*, 256 F.3d at

1079; *Kinman v. N.H. Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006).[9]  In fact,

the evidence establishes that George received medications during his incarceration

and medication services while on the detoxification regimen.[10]  Doc. 153-15 at 4-

---

[9]Relying on *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005),
and *Finn v. Haddock*, 459 F. App'x 833 (11th Cir. 2012), Sheriff Hale contends that the ADA
and Rehab Act do not apply to decisions involving medical care.  To the extent George contends
that his medical treatment was below the standard of care, the court agrees because "the ADA
does not create a remedy for medical malpractice."  *Bryant v. Madigan*, 84 F.3d 246, 249 (7th
Cir. 1996).

[10]The court is not persuaded by George's reliance on *Kinman*, 451 F.3d at 286-287, for
his contention that Sheriff Hale denied him medical services based on his disability.  In *Kinman*,
the court determined that the plaintiff established a triable issue of fact "as to whether [the
defendants] failed to provide [the plaintiff] with access to his prescription medications" because
the defendants "outright deni[ed]" the plaintiff medical services when they *knew* the plaintiff had
a "serious disability" based on his medical evaluation, and failed to provide the plaintiff the
medication even though they prescribed medication to treat the plaintiff's symptoms.  *Id.* at 278,
287 (emphasis added).  Conversely, here, George admitted that he received treatment after every
purported seizure, received detoxification medications and a psychiatric evaluation and

5.  Moreover, at George's request, the Jail's psychiatrist examined George and prescribed anti-anxiety and anti-depressant medications.  Doc. 146-16 at 7; 146-27 at 39.  Accordingly, George cannot establish the denial of medical services prong and his claim fails.

2.  *Placement on the detoxification protocol*

Likewise, George cannot sustain a claim based on the decision to place him on the detoxification protocol.  George failed to present evidence to establish that the standing detoxification protocol is so unreasonable that the prescription of it discriminated against George based on his purported disability.  *See Lesley*, 250 F.3d at 58 (finding that a physician's decision may be so unreasonable "as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes.").  While George is free to disagree with the necessity for the detoxification protocol, medical judgments "do not ordinarily fall within the scope of the ADA or Rehab Act."  *See Fitzgerald*, 403 F.3d 1134, 1144 (10th Cir. 2005); *Schiavo*, 403 F.3d at 1294 ("The Rehab[ ] Act, like the ADA, was never intended to apply to decisions involving . . . medical treatment.").  As one court succinctly put it, "[t]he decision was simply a reasoned medical judgment with which the

medications, rejected medical observation, and the Jail placed George on level two for medical monitoring during the detoxification.  Therefore, the facts here fail to establish an outright denial of medical care and are distinguishable from *Kinman*.

patient disagreed.  As to such disagreements, when they warrant litigation, state medical malpractice law, not the Rehab[ ] Act, provides the appropriate law of resort."  *Lesley v. Hee Man Chie*, 250 F.3d 47, 58 (1st Cir. 2001).

Based on the evidence, George can show only that the Jail medical staff negligently failed to verify his prescription medication and that this resulted in the denial of certain benefits and services.  Because the evidence before this court is insufficient to sustain a claim under the ADA or Rehab Act, Sheriff Hale's motion is due to be granted.[11]

## IV.  CONCLUSION

By separate order, the court will dismiss the claims against "Nurse Brown" and "Nurse Quarrelson" for want of prosecution, grant Sheriff Hale's motion on the ADA and Rehab Act claims and Deputy Davis and Nurses Ballenger, Hatcher, Pickett, Calvert, and Eatmon's motions on the § 1983 claim, and deny Nurses Fowler and Gamble's motions.

Done this 30th day of September, 2013.

**ABDUL K. KALLON**
**UNITED STATES DISTRICT JUDGE**

---

[11]In light of the court's determination that George's ADA claim against Sheriff Hale is due to be dismissed, the court declines to address the abrogation of Sheriff Hale's sovereign immunity based on his purported constitutional violations of the ADA.